78 F.3d 585
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL AIR TRAFFIC CONTROLLERS ASSOCIATION, MEBA, AFL-CIO;
David Clinkscale; and Margaret Graham,
Plaintiffs-Appellants,
v.
Frederico PENA, Secretary of the Department of
Transportation, and David Hinson, Administrator of
the Federal Aviation Administration,
Defendants-Appellees.
 No. 95-3016.
 United States Court of Appeals, Sixth Circuit.
 March 7, 1996.
 
 Before: ENGEL and MILBURN, Circuit Judges; and WEBER, District Judge.*
 MILBURN, Circuit Judge.
 
 
 1
 The National Air Traffic Controllers Association, MEBA, AFL-CIO ("NATCA"); David Clinkscale; and Margaret Graham appeal the dismissal under Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6) for lack of standing of their action against the Department of Transportation and the Federal Aviation Administration ("FAA") which challenged the FAA's decision to privatize air traffic control responsibilities at Level 1 air traffic control towers. For the reasons that follow, we reverse and remand.
 
 I.
 A.
 
 2
 In September of 1993, the FAA, a division of the Department of Transportation, decided to contract out to the private sector the air traffic control responsibilities of all 115 of its Level 1 air traffic control towers.[1] This action was taken without informing the National Air Traffic Controller Association ("NATCA"). As a result, approximately 1500 air traffic employees of the federal government working at Level 1 towers must either leave the field, be trained to operate Level 2 to 5 towers, or find employment with the private contractor who takes over their Level 1 tower.
 
 
 3
 The process of contracting out the Level 1 towers has already begun, as 24 towers were privatized in 1994. Under the FAA's plan, approximately 25 additional towers will be privatized each year until all are privatized in 1997.
 
 
 4
 Office of Management and Budget ("OMB") Circular A-76, issued in 1983, controls the procedure whereby government services are contracted out to the private sector. In general, OMB Circular A-76 prohibits the federal government from performing an activity that could be performed for less cost by the private sector. In particular, whenever the activity can be performed by the private sector, OMB Circular A-76 requires a comprehensive cost comparison be performed to ascertain which would be the more economical route. However, an agency may issue a waiver eliminating the cost comparison requirement for private sector contracting. Additionally, OMB Circular A-76 prohibits inherently governmental functions from being contracted out to the private sector. OMB Circular A-76 also requires each agency to establish an internal appeals procedure whereby the contracting out process may be administratively reviewed. Despite these requirements, OMB Circular A-76 states that it does not establish legally enforceable rights or obligations.
 
 B.
 
 5
 On March 18, 1994, NATCA and two individual air traffic controllers who work at Burke Lakefront Airport[2] in Cleveland, Ohio, filed this action against Frederico Pena, the Secretary of the Department of Transportation, and David Hinson, the Administrator of the FAA. Plaintiffs alleged in their complaint that defendants violated OMB Circular A-76 and the two statutory schemes which established the OMB and its Office of Federal Procurement Policy; namely, the Budget and Accounting Act of 1921 ("Act of 1921"), 31 U.S.C. § 101 et seq. and the Office of Federal Procurement Policy Act Amendments of 1979 (the "OFPPAA"), 41 U.S.C. § 401 et seq. Specifically, plaintiffs alleged that the FAA improperly waived the cost comparison requirement, that air traffic control services are inherently governmental functions, and that contracting out air traffic control services would impair the national defense. Plaintiffs sought a declaration that the decision to contract out services at Level 1 control towers was unlawful, and they also sought an injunction prohibiting the execution of the plan to contract out those services. In response, defendants moved for dismissal or, in the alternative, summary judgment.
 
 
 6
 On November 28, 1994, the district court granted defendants' motion to dismiss for lack of standing. The district court did not base its decision on the standing requirements of Article III of the Constitution of the United States but instead reasoned that plaintiffs did not have standing to sue under the additional prudential requirements of the Administrative Procedure Act ("APA") which requires plaintiffs' interest be within the "zone of interests" of the relevant statute. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990). In making its decision, the district court held that plaintiffs' injury, the loss of their government jobs, was not within the zone of interests of the relevant statutes and that any interest the plaintiffs had under OMB Circular A-76 was not a basis for standing because OMB Circular A-76 is not a statute. This timely appeal followed.
 
 II.
 
 7
 Plaintiffs argue that the district court erred in dismissing their action for lack of standing. In reviewing a dismissal based on Fed.R.Civ.P. 12(b)(6), we "must accept all of the plaintiff's allegations as true and resolve every doubt in his favor." Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489 (6th Cir.1990). Further, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). We apply a de novo standard of review to a dismissal by a district court under Fed.R.Civ.P. 12(b)(6). Craighead, 899 F.2d at 489.
 
 
 8
 The issue of standing is "a threshold question" in all federal cases. Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta, 713 F.2d 1221, 1225 (6th Cir.1983). This threshold question "in no way depends on the merits of the [case]...." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).[3] In addition to the Article III standing requirements of the Constitution, there are prudential standing requirements which must be met by certain federal plaintiffs. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). These prudential requirements were added by the judiciary "to limit access to the federal courts to those litigants best suited to assert a particular claim." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979). This appeal only concerns plaintiffs' prudential requirements for standing.
 
 
 9
 In the present case, plaintiffs seek to establish standing under the APA. Under the APA, 5 U.S.C. § 702, plaintiffs must demonstrate 1) that they have suffered a legal wrong due to the challenged agency action or are adversely affected within the meaning of a relevant statute and 2) that their interest is within the "zone of interests" protected or regulated by the relevant statute. Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO, 498 U.S. 517, 523 (1991). Plaintiffs' interest must only be arguably within the zone of interests of the relevant statute. Director, Office of Workers' Comp. Programs v. Newport News Shipbuilding and Dry Dock Co., 115 S.Ct. 1278, 1283 (1995).
 
 
 10
 Plaintiffs argue that they "will be injured by the loss of government employment, wages and benefits" by the decision to contract out air traffic control services at Level 1 towers. J.A. 10. They further argue that the FAA's decision violates OMB Circular A-76's prohibition against contracting out inherently governmental services and that they should have standing to ensure that the inherently governmental services they perform remain services only performed by the federal government. Thus, the interest plaintiffs assert is not confined to their individual loss of government employment. Instead, plaintiffs' interest encompasses the relationship between their loss of employment and the wholesale privatization of their jobs in a manner in which they argue violates federal law prohibiting the privatization of an inherently governmental function.
 
 
 11
 To determine whether the loss of plaintiffs' government jobs in this manner is an interest within the zone of interests of the relevant statutes, we must first determine which statutes are "relevant statutes" under 5 U.S.C. § 702. As stated in Nat'l Wildlife Fed'n, the relevant statutes are those statutes "whose violation is the gravamen of the complaint." Nat'l Wildlife Fed'n, 497 U.S. at 886. In their prayer for relief, plaintiffs ask that the defendants' decision to contract out Level 1 air traffic control services be declared unlawful under the Act of 1921, the OFPPAA, and OMB Circular A-76. In their complaint, plaintiffs also discuss the Federal Aviation Act of 1958, 49 U.S.C. § 1301, and the Department of Transportation Act of 1966, 49 U.S.C. § 10101, as indicative of the congressional policy to retain air traffic control services as inherently governmental functions. Because those statutes are not the gravamen of the complaint, they are not the relevant statutes for determining plaintiffs' standing. Rather, those statutes should be used to evaluate the merits of this case: whether Level 1 air traffic control services are inherently governmental functions. Therefore, because we do not address the merits of a case in a standing inquiry, see Whitmore, 495 U.S. at 155, we look only to the OFPPAA and the Act of 1921 to determine plaintiffs' standing.
 
 
 12
 While plaintiffs assert that OMB Circular A-76 should also be considered as a relevant statute, we agree with the holding in Nat'l Fed'n of Fed. Employees v. Cheney, 883 F.2d 1038, 1043 (D.C.Cir.1989), that OMB Circular A-76 is not a statute and cannot form the basis for standing. However, that does not mean that OMB Circular A-76 is irrelevant in evaluating plaintiffs' standing. As the Supreme Court stated in Clarke v. Sec. Indus. Assoc., 479 U.S. 388, 401 (1987), "we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes" behind the relevant statute. To the extent that the policies of OMB Circular A-76 are reflected in the OFPPAA and can inform our understanding of the OFPPAA, its policies may be considered in determining standing.
 
 
 13
 The Court's opinion in Clarke gives the most recent and most extensive analysis of the meaning of the zone of interest test for standing. The Court stated that
 
 
 14
 [t]he "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency action. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would be plaintiff.
 
 
 15
 Clarke, 479 U.S. at 399-400 (emphasis added). See also Community First Bank v. Nat'l Credit Union Admin., 41 F.3d 1050, 1054 (6th Cir.1995). In Community First Bank, we also quoted from Clarke another formulation of the zone of interests: whether the interests asserted by the plaintiff "had a plausible relationship to the policies underlying the legislation." Id. at 1054 (quoting Clarke, 279 U.S. at 403). In applying the zone of interests test, we are not required to find an explicit statutory provision stating that the plaintiff's interest is encompassed within. Rather, legislative history may constitute a source for interpreting the statute's zone of interest. See Air Courier Conference of Am., 498 U.S. at 526.
 
 
 16
 In the first section of the OFPPAA, Congress states that their policy is to promote "economy, efficiency and effectiveness in the procurement of property and services by the executive branch of the Federal Government." 41 U.S.C. § 401. As such, the OFPPAA establishes in the OMB an Office of Federal Procurement Policy to oversee the implementation of this efficiency goal which primarily involves the contracting out of government products and services and the competitive bidding process. At first glance, the OFPPAA's emphasis on contracting out government services to the private sector seems antithetical to the interests of plaintiffs in retaining their federal employment. However, as stated above, plaintiffs' interest is not just keeping their jobs but extends to ensuring that the FAA does not privatize inherently governmental functions. That interest, which is expressed in OMB Circular A-76,[4] is reflected in a congressional committee report issued in conjunction with the enactment of the OFPPAA.
 
 The report states:
 
 17
 The new [contracting out] policy is built on three principles:
 
 
 18
 1. Rely on the private sector. The Government's business is not to be in business. If private sources are available, they should be looked to first to provide the commercial or industrial services needed by the Government.
 
 
 19
 2. Retain certain governmental functions in-house. Certain functions are inherently governmental in nature being so closely related to the public interest as to demand performance by Federal employees.
 
 
 20
 3. Aim for economy. Use cost comparison. When private performance is feasible and no overriding factors require in-house performance, the taxpayer deserves and expects the most economical performance and therefore rigorous comparison of contract cost versus in-house cost should be used when appropriate to decide how the work will be done.
 
 
 21
 Nat'l Fed'n of Fed. Employees, 883 F.2d at 1049 (quoting S.Rep. No. 144, 96th Cong., 1st Sess. 4 (1979), U.S.CODE CONG. & ADMIN.NEWS 1979, p. 1492.) (emphasis added).
 
 
 22
 Thus, in addition to promoting the efficient contracting out of government services, the OFPPAA seeks to preserve government functions which are so inherently governmental that they should not be privatized. This is the very interest asserted by the plaintiffs in this case, and we hold that plaintiffs' interest is within the zone of interests of the OFPPAA.[5] Indeed, plaintiffs are the very subject of the FAA's decision to privatize Level 1 air traffic control services. See Clarke, 479 U.S. at 399. Certainly, at a minimum, plaintiffs' interest constitutes a more than a marginal relationship to the purposes of the OFPPAA and is plausibly related to the OFPPAA's policy of retaining inherently governmental services. Id. at 399, 403. As recognized in Ass'n of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 154 (1970), the likelihood of financial injury serves to make a plaintiff "a reliable attorney general" to litigate public interests within the zone of interests test. If these plaintiffs could not challenge the administrative decision in this case, then there would be no plaintiff who could protect the public interest. Thus, plaintiffs' interest satisfies the zone of interest test. However, defendants argue that Air Courier Conference of Am. and Nat'l Fed'n of Fed. Employees mandate the opposite conclusion. We disagree.
 
 
 23
 In Air Courier Conference of Am., a union representing postal workers challenged the Postal Service's decision to approve an exception to the Private Express Statutes ("PES") for international remailing. The Supreme Court held that the postal unions did not have standing to sue under the PES because the postal employees' potential loss of job opportunities did not fall within the zone of interest of the PES which was designed to "ensure that postal services will be provided to the citizenry at large, and not to secure employment for postal workers." Air Courier Conference of Am., 498 U.S. at 528. The Court looked to the wording of the PES and its legislative history in making that determination. Similarly, we have examined the OFPPAA and its legislative history. Unlike the PES, the legislative history of the OFPPAA evinces an interest in preserving federal employment when that employment involves inherently governmental functions. Thus, our analysis is in accord with the Court's analysis in Air Courier Conference of Am. The only difference is the ultimate result which is mandated by the different statutes involved in the two cases.
 
 
 24
 In Nat'l Fed'n of Fed. Employees, a group of federal employees challenged the Army's decision to contract out its motor pool. At issue was the application of the zone of interest test to the same statutes involved in the present case, the OFPPAA and the Act of 1921; and, additionally, the National Defense Authorization Act of 1987. The D.C. Circuit held that the employees' interest in preserving their government jobs was not within the zone of interests of the relevant statutes, and, therefore, the federal employees lacked standing to sue. Nat'l Fed'n of Fed. Employees, 883 F.2d at 1050. However, the issue in Nat'l Fed'n of Fed. Employees was solely confined to the federal employees' challenge that the Army had erred in its cost comparison calculation. Thus, with regard to the OFPPAA, the D.C. Circuit's analysis was confined to whether the loss of federal government jobs due to an error in the cost comparison determination was within the zone of interest of the OFPPAA. The D.C. Circuit concluded that the protection of federal jobs was not within the OFPPAA's interest of promoting efficiency in government. Id. at 1049. The court specifically noted that no assertion had been made in its case that the goods or services involved were inherently governmental, and the court quoted from the legislative history of the OFPPAA indicating the importance of retaining inherently governmental services. Id. Accordingly, the question of standing in relation to inherently governmental functions was not presented in Nat'l Fed'n of Fed. Employees, and the ultimate result differed because the interest of the OFPPAA in preserving inherently governmental functions was not implicated by the plaintiffs in that case. Thus, our decision in this case is not at odds with Nat'l Fed'n of Fed. Employees.
 
 
 25
 Our decision is in accord with the long line of Supreme Court precedent which, prior to Air Courier Conference of Am., has never dismissed a case for lack of standing under the "not ... especially demanding" zone of interest test. Clarke, 479 U.S. at 399. Additionally, this decision is in accord with our decision in Diebold v. United States, 947 F.2d 787, 789-90 (6th Cir.1991), which held that agency decisions to privatize government services are reviewable and that OMB Circular A-76 constituted law to apply.
 
 
 26
 While we have concluded that plaintiffs' interests are sufficient for standing under the zone of interest test, as earlier stated, this is only one part of the requirements for standing. Once the district court concluded that plaintiffs' interests were not within the zone of interest of the relevant statutes, the court dismissed the case and did not address the constitutional requirements for standing. See Defenders of Wildlife, 504 U.S. at 560-61 (discussing the Article III requirements for standing). As the parties did not address these constitutional requirements in their briefs on appeal, we are unable to complete the determination of plaintiffs' standing. The government did argue to the district court that plaintiffs did not meet the Article III requirements for standing and that NATCA did not meet the requirements for associational standing. Thus, the parties disagree over these additional standing components, and it is necessary for us to remand this case to the district court to complete the standing analysis and to address the merits, if needed.
 
 III.
 
 27
 For the reasons stated, the district court's dismissal of this action for lack of standing is REVERSED, and this case is REMANDED to the district court for further proceedings consistent with this opinion. We, however, do not suggest or imply in any way what the eventual outcome of this case should be.
 
 
 
 *
 The Honorable Herman J. Weber, District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 All air traffic control towers are classified on a scale from Level 1 to Level 5 depending on the volume and complexity of the air traffic that it handles. Level 1 towers use only visual flight rules and are not equipped with any of the radar equipment used for instrumental flight rules
 
 
 [2]
 The air traffic control tower at Burke is a Level 1 tower
 
 
 [3]
 The government argues that 49 U.S.C. § 47124 should be considered because Congress directs in that statute that the Department of Transportation shall continue its contracting out of Level 1 air traffic control towers. However, that provision is irrelevant as it only pertains to "Agreements for State and Local operation of airport facilities." 49 U.S.C. § 47124. Furthermore, consideration of that statute would be an inappropriate inquiry into the merits of this case
 
 
 [4]
 OMB Circular A-76 6.e states that "[a] Governmental function is a function which is so intimately related to the public interest as to mandate performance by Government employees." J.A. 54
 
 
 [5]
 Because we conclude that plaintiffs' injury is within the zone of interest of the OFPPAA, we do not address the issue of whether plaintiffs' injury is within the zone of interest of the Act of 1921