**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,**

v.

**Major General George T. BABBITT, Commander, Air Force Material Command, et al., Defendants.**

**No. C–3–00–131.**

United States District Court, S.D. Ohio, Western Division.

March 27, 2001.

---

Martin R. Cohen, Cala Cynwyd, PA, Mark D. Roth, AFGE General Counsel, Washington, DC, Donald James Mooney, Jr., Ulmer & Berne, Cincinnati, OH, for plaintiffs.

Vincent M. Garvey, Department of Justice, Federal Programs Branch, Civil Division, Washington, DC, Daniel Bensing, U.S. Department of Justice, Civil Division/Federal Programs Branch, Washington, DC, for defendants.

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (DOC. # 5); JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFFS; TERMINATION ENTRY.

RICE, Chief Judge.

This litigation stems from a decision by the United States Department of the Air Force ("Air Force") to out-source its civil engineering work at Tinker Air Force Base ("Tinker") in Oklahoma City, Oklahoma. The Plaintiffs are three federal civilian employees of Tinker and their labor union, the American Federation of Government Employees, AFL–CIO ("AFGE"). They contend that the Air Force failed to follow applicable laws and regulations when it awarded the civil engineering function at Tinker to DynPar Corporation, a private contractor. The Plaintiffs assert that if the applicable laws and regulations had been followed, the Air Force would have found it more cost-effective to award the engineering work to Tinker's federal civilian employees. In Count I of their Complaint, the Plaintiffs allege that the Air Force's awarding of the contract to DynPar violated (1) OMB Circular A–76, (2) the OMB A–76 Handbook,[1] (3) two statutes authorizing OMB Circular A–76, namely the Budget and Accounting Act of 1921, 31 U.S.C. § 1, *et seq.*, and the Office of Federal Procurement Policy Act Amendments of 1979, 41 U.S.C. § 401, *et seq.*, and (4) the Federal Activities Inventory Reform Act of 1998, P.L. 105–270. (Doc. # 1 at ¶ 28). In Count II, the Plaintiffs allege that the Air Force's actions violated (1) OMB Circular A–76, (2) the OMB A–76 Handbook, (3) each of the foregoing statutes, and (4) various sections of federal procurement statutes, to wit: 10 U.S.C. §§ 2304, 2461, 2462, 2463, 2467, 2468, 2469, and 2469a. In Count III, the Plaintiffs invoke the Administrative Procedure Act, which makes judicial review available to those who have been "aggrieved by agency action within the meaning of a relevant statute."

Pending before the Court is a Motion to Dismiss for Lack of Subject–Matter Juris-

---

1. OMB Circular A–76 and the accompanying Handbook set forth a detailed procedure for federal agencies to determine whether it is more cost-effective to perform work "in-house" or to out-source the work to a private company.

diction (Doc. # 5) filed by the Defendants, Major General George T. Babbitt, Commander of the Air Force Material Command at Wright Patterson Air Force Base in Dayton, Ohio, and Major General Michael E. Zettler, Commander of the Oklahoma City Air Force Material Command at Tinker.

## I. *Analysis*

In support of their Rule 12(b)(1) Motion, the Defendants contend that the Plaintiffs lack standing to challenge the Air Force's decision to award the engineering contract to DynPar. For purposes of resolving the Defendants' Motion, the Court need not delve into the intricacies of government contracting law or the merits of this litigation. Rather, the Court will assume, as it must at this stage, that the Air Force unlawfully awarded a multi-million-dollar contract to DynPar. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."). As a result, the Court turns directly to the issue of standing.

In *Coyne v. American Tobacco Co.,* 183 F.3d 488 (6th Cir.1999), the Sixth Circuit summarized the law of standing as follows:

> Standing is "the threshold question in every federal case." *Warth,* 422 U.S. at 498, 95 S.Ct. 2197. The Supreme Court has stated that the standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into " 'a vehicle for the vindication of the value interests of concerned bystanders.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *United States v. SCRAP,* 412 U.S. 669,

687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)). To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be "fairly traceable" to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury. *See Valley Forge,* 454 U.S. at 472, 102 S.Ct. 752. Hence, the "irreducible minimum" constitutional requirements for standing are proof of injury in fact, causation, and redressability. *See id.* A plaintiff bears the burden of demonstrating standing and must plead its components with specificity. *See id.*

> In addition to the constitutional requirements, a plaintiff must also satisfy three prudential standing restrictions. First, a plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. 2197 (citations omitted). Second, a plaintiff's claim must be more than a "generalized grievance" that is pervasively shared by a large class of citizens. *See Valley Forge,* 454 U.S. at 474–475, 102 S.Ct. 752. Third, in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by the statute in question. *See id.* These additional restrictions enforce the principle that, "as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted." *Pestrak v. Ohio Elections Comm'n,* 926 F.2d 573, 576 (6th Cir. 1991).

*Id.* at 493–494.

In the present case, the Defendants contend that the Plaintiffs fail to satisfy either the Article III standing requirements or the prudential standing restrictions. Having reviewed the parties' Memoranda and

applicable case law, the Court agrees that the Plaintiffs cannot satisfy all of the prudential considerations identified by the Sixth Circuit in *Coyne*.[2] For the reasons set forth more fully below, the Court concludes (1) that the individual Plaintiffs cannot rely on OMB Circular A–76 or the OMB A–76 Handbook to satisfy the prudential standing requirements, (2) that the individual Plaintiffs' interests fall outside the "zone of interests" protected or regulated by the various statutes under which they bring the present action, (3) that to the extent the individual Plaintiffs *might* be capable of positioning themselves within the "zone of interests" of a relevant statute, they assert nothing more than a generalized grievance, which is insufficient to establish standing; and (4) that AFGE lacks "associational standing" because the individual plaintiffs lack standing.

A. *Plaintiffs' Reliance on OMB Circular A–76 and the OMB A–76 Handbook*

 In their Memorandum, the Plaintiffs first suggest that they fit within the "zone of interests" of OMB Circular A–76 and/or the OMB A–76 Handbook for purposes of the prudential standing requirements set forth above. (Doc. # 12 at 10–11). Upon review, the Court finds the Plaintiffs' reliance upon OMB Circular A–76 and the OMB A–76 Handbook to be misplaced. As will be discussed more fully, *infra*, the "zone of interests" test requires the Court to consider whether the interests advances by the Plaintiffs fall within the "zone of interests" protected or regulated by a relevant *statute*. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). A relevant statute is one "whose violation is the gravamen of the complaint." *Id.* at 886, 110 S.Ct. 3177. The Sixth Circuit has recognized that "OMB Circular A–76 is not a statute and cannot form the basis for standing."[3] *National Air Traffic Controllers Ass'n v. Pena*, 78 F.3d 585, 1996 WL 102421 (6th Cir. March 7, 1996) (unpublished); *see also National Federation of Federal Employees v. Cheney*, 883 F.2d

---

**2.** In light of this conclusion, the Court need not address the Defendants' arguments regarding the Plaintiffs' alleged lack of Article III standing. *See, e.g., Grand Council of the Crees v. Federal Energy Regulatory Commission*, 198 F.3d 950, 959 (D.C.Cir.2000) (resolving issue of prudential standing before addressing Article III standing); *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir.1987) ("Because we conclude that Hong Kong lacks standing under the first prudential limitation, we need not address the [A]rticle III question.").

**3.** In their Memorandum, the Plaintiffs note that the Sixth Circuit has identified OMB Circular A–76 as part of the "law to apply" for purposes of reviewing federal agency procurement decisions. *See Diebold v. United States*, 947 F.2d 787, 801 (6th Cir.1991). The Sixth Circuit made this statement in the context of determining whether such decisions are subject to review at all under the Administrative Procedure Act ("APA"). When there is no "law to apply," an agency's decision is committed to its sound discretion, and review under the APA is unavailable. *Id.* at 789. In *Diebold*, however, the Sixth Circuit held that federal agency procurement decisions are subject to APA review, and that OMB Circular A 76 constitutes part of the "law to apply." This statement had nothing to do with the standing of federal civilian employees to seek such review. In fact, the *Diebold* court expressly declined to reach the issue of standing, given that the district court had dismissed the case solely on the basis that APA review of procurement decisions was unavailable to anyone. *Id.* at 811. As a result, while OMB Circular A–76 constitutes part of the "law to apply" for purposes of judicial review of the merits of an agency's decision, the Circular does not provide a basis for standing. *National Air Traffic Controllers Ass'n v. Pena*, 78 F.3d 585, 1996 WL 102421 (6th Cir. March 7, 1996) (unpublished); *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038, 1043 (D.C.Cir.1989).

1038, 1043 (D.C.Cir.1989) ("The issue is *not* whether appellants' interests are within the zone of interests of OMB Circular A–76. . . . The Circular is not a statute . . . and, although promulgated pursuant to congressional authority, the Circular itself cannot grant standing."). In short, the Plaintiffs "must be within the zone of interest[s] of the statutes authorizing OMB Circular A–76, not OMB Circular A–76, itself." [4] *Id.*

**B.** *Plaintiffs' Interests Fall Outside the "Zone of Interests" of the Relevant Statutes*

▆▆▆ As noted, *supra,* the Plaintiffs cannot establish prudential standing unless the interests that they assert in the present case come within the "zone of interests" protected or regulated by the statutes upon which they rely. The "zone of interests" test is not demanding, however, and the Plaintiffs need only to establish that their interests are "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 487, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). In *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the Supreme Court explained that the "zone of interests" test

> . . . is a guide for deciding whether, in view of Congress' evident intent to make agency decision presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency action. In cases where the plaintiff is not itself the subject of the contested . . . action, the test denies a right of review if the plaintiff's interests are so margin-

ally related to or inconsistent with the purposes implicit in the [relevant] statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be particularly demanding; in particular there need be no indication of congressional intent to benefit the would-be plaintiff.

*Id.* at 399–400, 107 S.Ct. 750.

With the foregoing standards in mind, the Court turns now to the statutes allegedly violated by the Air Force and the interests asserted by the Plaintiffs. As noted above, the statutes upon which the Plaintiffs rely are (1) the Budget and Accounting Act of 1921, 31 U.S.C. § 1, *et seq.,* (2) the Office of Federal Procurement Policy Act Amendments of 1979, 41 U.S.C. § 401, *et seq.,* (3) the Federal Activities Inventory Reform Act of 1998, P.L. 105–270, and (4) various sections of federal procurement statutes, namely 10 U.S.C. §§ 2304, 2461, 2462, 2463, 2467, 2468, 2469, and 2469a.

In their Memorandum, the individual Plaintiffs identify two interests at stake in this litigation: (1) their interest "in their continuation of their current jobs as federal employees"; and (2) their "interest in a legally conducted and fair public/private competition" with respect to the awarding of the engineering contract. (Doc. # 12 at 9). The Plaintiffs insist that these interests fall within the "zone of interests" of the statutes allegedly violated by the Air Force. Upon review, however, the Court concludes that the first interest advanced by the Plaintiffs is actually inconsistent with the purposes of the statutes at issue.

---

**4.** This is not to say that OMB Circular A–76 and the Handbook are entirely irrelevant to the issue of standing. "To the extent that the policies of OMB Circular A–76 are reflected in [a relevant statute] and can inform [the Court's] understanding of [a relevant statute], its policies may be considered in determining standing." *National Air Traffic Controllers Ass'n v. Pena,* 78 F.3d 585, 1996 WL 102421 (6th Cir. March 7, 1996).

In addition, as will be explained more fully, *infra,* the Plaintiffs' second interest constitutes nothing more than a "generalized grievance," which is insufficient to satisfy the prudential standing requirements.

With respect to the first interest asserted by the Plaintiffs, namely their interest "in their continuation of their current jobs as federal employees," several courts have recognized that such an interest is antithetical to the purposes of the statutes upon which the Plaintiffs rely. The seminal case regarding the standing of federal civilian employees to challenge "contracting out" decisions is *National Federation of Federal Employees v. Cheney,* 883 F.2d 1038 (D.C.Cir.1989). In *Cheney,* the D.C. Circuit held that "the interests of in-house federal employees are in fact inconsistent with the animating purpose of" the Budget and Accounting Act of 1921, which was intended to increase government efficiency in part by eliminating some federal jobs. *Id.* at 1044–1046. In reaching this conclusion, the D.C. Circuit reasoned:

> In the present case, the legislative history of the Budget and Accounting Act of 1921, as amended, leads us to conclude that Congress did not contemplate in-house federal employees and federal employee labor unions as plaintiffs. Congress carefully crafted a two-pronged checks and balances budgeting process to coordinate the United States budgeting process, eliminate duplication of services, and promote efficiency. Congress knew that some federal employees would be adversely affected and, instead of giving these employees some recourse, intentionally removed the director of the Bureau of the Budget from as much external pressure as possible so that he could make the "hard" decision to reduce the employee force where necessary. At most, federal employees' interests are marginally related to this centralized annual budgeting process

balanced between the Executive and Legislative branches. *Cf. Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. It is more logical to conclude that federal employees' interests are "inconsistent." *Id.* Appellants' alleged particular interest in the instant case is protection of the federal jobs of their members, not governmental efficiency as asserted by them.

*Id.* at 1048.

The *Cheney* court also concluded that the interests of the government workers in that case were inconsistent with the purposes of the Office of Federal Procurement Policy Act Amendments of 1979, upon which the Plaintiffs rely in the present case. With respect to this piece of legislation, the *Cheney* court reasoned:

> After a thorough review of the OFPAA and its legislative history, we have found nothing to suggest a congressional purpose more than marginally related to the interests of federal employees vis-a-vis procurement policy. Throughout the legislative history of OFPPAA and its amendments, Congress emphasized economy and efficiency in government operations. Specifically regarding "contracting out," the Senate Committee on Governmental Affairs recognized that there had been a longstanding "executive branch policy of reliance on the private sector" to improve governmental efficiency as expressed in earlier versions of OMB Circular A–76. S.Rep. No. 144, 96th Cong., 1st Sess. 4 (1979), U.S.CODE CONG. & ADMIN.NEWS 1979, p. 1492. Congress specifically validated this Executive branch policy favoring the private sector in its enactment of the OFPPAA....

> Since the legislative history of the OFPPAA endorses the Executive branch policy of reliance on the private sector and the Circular finds authority in the

OFPPAA, it is difficult to conclude anything but that the interests of federal employees are inconsistent with the purposes of OFPPAA. As previously discussed, appellants' real interest in this case is the protection of the federal jobs of its members, not efficiency in governmental operations.... Their real interest in job protection flies in the face of a policy that federal departments and agencies, through OMB Circular A–76, should rely on the private sector. Thus, appellants' interests are inconsistent with the purposes of the OFPPAA and not within the zone of interest of that Act....

*Id.* at 1049.

Finally, the *Cheney* court rejected the federal workers' reliance on the National Defense Authorization Act of 1987, 10 U.S.C. § 2304, which is also cited by the Plaintiffs herein. As the D.C. Circuit noted, that piece of legislation required the Secretary of Defense to "ensure that all costs considered in a [contracting out decision] ... are realistic and fair." *Id.* at 1050. The *Cheney* court held that this purpose was inconsistent with the interests of federal civilian employees, reasoning:

> From our review of the legislative history, the phrase "realistic and fair" was added to the Authorization Act to protect the private government contractor in the contracting out process against undue built-in "bias" favoring in-house performance of services....
>
> ... As discussed above, appellants' real interest in a decision to contract out is the protection of the jobs of their members. Private contractors competing to perform the same services that appellants' members now perform are the central threat to these government union members' jobs. The interests of the in-house federal employees are therefore "antithetical" to the interests

of the private contractors because "federal employees present an 'either-or' situation in relation to private" contractors. *American Federation of Government Employees, Local 1668 v. Dunn*, 561 F.2d 1310, 1313 (9th Cir.1977) (federal employees lack standing to contest a contracting out of an Air Force food service facility). Thus appellants' interest is inconsistent with the purpose of the section 1223(b) which provides for contracting out where that is the most cost-efficient alternative. It follows that appellants' interests are not within the zone of interests of the Authorization Act of 1987.

*Id.* at 1050–1051.

In recent rulings, several federal courts have followed the D.C. Circuit's reasoning in *Cheney*, holding that civilian employees and their unions lacked standing to challenge federal agency "contracting out" decisions. *See, e.g., American Federation of Government Employees v. Cohen*, 171 F.3d 460, 470 (7th Cir.1999) (citing *Cheney* for the proposition that civilian employees who challenge a federal agency out-sourcing decision are not within the "zone of interests" protected or regulated by 10 U.S.C. § 2462 and § 2463, both of which are cited by the Plaintiffs herein); *American Federation of Government Employees v. United States*, 2001 WL 262897 (W.D.Tex. March 7, 2001) (unpublished); *American Federation of Government Employees v. United States*, 46 Fed.Cl. 586 (Fed.Cl.2000); *Courtney v. Smith*, No. 4:00cv1247 (N.D.Ohio Nov. 15, 2000) (unpublished). Without repeating the analysis set forth in each of these opinions, the Court notes that it finds the reasoning contained therein to be equally applicable in the present case.

The Court also notes that in two of the foregoing cases, the courts expressly rejected the proposition that federal workers

who challenge an out-sourcing decision come within the "zone of interests" protected or regulated by other statutes upon which the Plaintiffs rely in the present case. In *American Federation of Government Employees v. United States*, 2001 WL 262897 (W.D.Tex. March 7, 2001), the district court recently rejected an argument that AFGE members who challenge an agency's out-sourcing decision are within the "zone of interests" of a second portion of the National Defense Authorization Act, namely 10 U.S.C. § 2467, which is cited in the Plaintiffs' Complaint. In reaching this conclusion, the district court reasoned:

> Section 2467(b)(1)(A) requires that, in determining whether to contract out under A–76, the DoD:

>> shall, at least monthly during the development and preparation of the performance work statement and the management efficiency study used in making that determination, consult with civilian employees who will be affected by that determination and consider the views of such employees on the development and preparation of that statement and that study....

> As the quoted language indicates, this section provides for specific rights of input, and' consideration of input, for employees and their representatives at the very early stages of the A–76 process, and particularly, during the preparation of the performance work statement and the management efficiency study. The specific right of input under this section occurs before the agency issues a solicitation requesting private contractors to submit proposals to be compared to the MEO.

> Even assuming, arguendo, that plaintiff has standing to complain about a failure of the USAF to engage in the early consultation described in the stat-

ute, there is no basis upon which that statute can provide plaintiff standing to bring the allegations made in its complaint. *Rather, plaintiff's claim is that, long after these preliminary stages in the A–76 process, the agency in responding to a GAO protest, overturned its October 24, 2000 administrative decision without consulting plaintiff or its members. It is clear from the plain language of the statute, however, that § 2467 only requires consultation during the performance work statement and the management efficiency plan development. Plaintiff makes no factual assertion that it is also complaining of the agency's failure to consult as mandated by § 2467.* Section 2467 does not control the agency's decision to not consult employees on litigation strategy before the GAO after the cost comparison had been performed. Therefore, while plaintiff may be within the zone of interests of this statute, it has not alleged that the agency has violated any of its requirements.

*Id.* at *9 (footnotes omitted and emphasis added).

■ The foregoing reasoning is equally applicable in the present case. Although § 2467 may require the Air Force to consult with its civilian employees during the out-sourcing process, the Plaintiffs *do not* make any factual allegations regarding a failure to consult in the present case. (*See* Complaint, Doc. # 1). Rather, they challenge the Air Force's decision to award the engineering contract to DynPar. As a result, the specific interests that they advance in the present litigation are not within the "zone of interests" protected or regulated by 10 U.S.C. § 2467.

■ Likewise, in *American Federation of Government Employees v. United States*, 46 Fed.Cl. 586 (Fed.Cl.2000), the Federal Court of Claims recently rejected

an argument that federal workers challenging an agency out-sourcing decision come within the "zone of interests" protected or regulated by the Federal Activities Inventory Reform Act of 1998, P.L. 105–270 ("FAIR"), upon which the Plaintiffs rely herein. "Under FAIR, agencies are required to identify those activities that are not 'inherently governmental' and thus, appropriate for contracting out to private sources." *Id.* at 589. "The statute further provides that when determining whether to contract with a private source for an activity ... on the basis of a cost comparison ..., 'the head of the executive agency shall ensure that all costs ... are considered and that the costs considered are realistic and fair.' " *Id.*

In the most recently cited case, the plaintiffs, two federal employees and their union, challenged an out-sourcing cost comparison on the basis that it was not accurate or realistic. *Id.* at 590. Upon review, the Court of Claims dismissed the action, holding that the plaintiffs lacked standing to challenge the cost comparison under FAIR or several other statutes. In so doing, that court expressly rejected an argument that the plaintiffs were within the "zone of interests" protected or regulated by FAIR. *Id.* at 597–600. In relevant part, the Court of Claims reasoned as follows: [5]

> ... Congress enacted FAIR in 1998 to encourage the federal government to contract out to private sources those governmental services that are "not inherently governmental in nature." ... To this end, FAIR establishes a process that directs federal agencies to review their activities annually and to establish a list of those activities that are "not inherently governmental," and therefore

appropriate for contracting out to private sources. *See* FAIR § 2(a), 112 Stat. at 2382.

Section 3(b) of FAIR identifies certain persons, including federal employees and their unions, as "interested parties" who "may submit to an executive agency a challenge of an omission of a particular activity from, or an inclusion of a particular activity on, a list ... under section 2[ (a) of this Act]." *Id.* § 3(a)-(b), 112 Stat. at 2383. Once an activity is on the list, the agency must make the activity available for competition. *See id.* § 2(d), 112 Stat. at 2383. Thereafter, if the agency is required to conduct a cost comparison between the private source and in-house performance of the work, FAIR requires that "all costs ... are considered and that the costs considered are realistic and fair," *see id.* § 2(e), 112 Stat. at 2383, in order to ensure "best value to the American taxpayer," 144 Cong. Rec. at S9104 (statement of Sen. Thomas). ...

Plaintiffs argue that because they are included in the definition of an "interested party" for the purpose of challenging the lists developed under section 2(a) of FAIR, and because FAIR preserved the notion of public-private competitions, their interests are within · the zone of interests to be protected under the entire statute.

*Although the plaintiffs' arguments have some surface appeal, upon closer scrutiny, it is clear that plaintiffs' interests with respect to cost comparisons are not within the zone of interests protected under FAIR.* In the plain language of FAIR, Congress specifically distinguishes between the agency's decision to place a particular activity on the list to

---

5. Given that the Court of Claims' decision is equally applicable herein, this Court will

quote from that opinion at some length.

be contracted out, *see* FAIR § 2(a), 112 Stat. at 2382, and the agency's decision to contract out to a particular source, *see id.* § 2(d)-(e), 112 Stat. at 2383. *Section 3(a) of FAIR is cognizant of this distinction and expressly limits authorized challenges to "an omission of a particular activity, or the inclusion of a particular activity on ... a list under section 2." Id.* § *3(a), 112 Stat. at 2383 (emphasis added). More specifically with regard to standing, section 3(b), which defines who is an "interested party," expressly limits challenges to those "with respect to an activity referred to in subsection [2](a)." Id.* § 3(b), 112 Stat. at 2383.

If Congress intended to provide "interested party" standing to challenge cost comparisons pursuant to a public-private competition under section 2(e), Congress would not have expressly limited such standing to challenges to the list. *Id.* § 2(e), 112 Stat. 2383. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 22, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)); *LeFevre v. Secretary, Dep't of Veterans Affairs,* 66 F.3d 1191, 1200 (Fed.Cir. 1995) (citing *Russello,* 464 U.S. at 22, 104 S.Ct. 296). *Accordingly, under the plain language, Congress did not intend for federal employees and their unions to be able to challenge cost comparisons.*

Moreover, no evidence exists in the legislative history of the FAIR Act that would dictate a contrary result. Congress recognized that even when an activity is listed as appropriate to be contracted out, federal employees might be able to perform that activity more economically than private contractors. Thus, FAIR allows for a public-private competition under section 2(e). *See* FAIR § 2(e), 112 Stat. at 2383. *However, according to the legislative history, if the agency conducts a public-private competition, the purpose of that competition is to provide the "best value to the American taxpayer;" the purpose is not to support continued employment by federal workers. See* 144 Cong. Rec. at S9104, quoted supra p. 597....

Plaintiffs in this case stand in no better position than the plaintiffs in *AFGE v. Cohen* [, 171 F.3d 460 (7th Cir. 1999) ]. They have not provided this court with any basis upon which to deviate from the precedent followed in that case. Although *AFGE* was decided under 10 U.S.C. § 2462, the legislative history indicates that[ ] Congress had the same purposes in mind in enacting FAIR that are evident in 10 U.S.C. § 2462(b). Indeed, as noted above, the cost comparison language reviewed in *AFGE v. Cohen* is identical to the language of section 2(e) of the FAIR Act. *See supra* p. 589 n. 6. Where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, as least insofar as it affects the new statute." *Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)....

Significantly, Congress enacted FAIR after the decision in *NFFE v. Cheney* and therefore can be presumed to have had knowledge of the interpretation given the cost comparison language in the provision. Congress had the opportunity to add protections for federal employment at that time, if it intended to do so. In fact, according to the legislative histo-

ry, federal employee unions, including AFGE, actively participated in formulation of the FAIR Act. *See* 144 Cong. Rec. at S9104, quoted *supra* p. 597.

Examined against this backdrop, this court is persuaded that Congress did not intend to include federal employees and their unions within the zone of interests protected by section 2(e) of FAIR or 10 U.S.C. § 2462(b). As such, these plaintiffs cannot establish standing under the APA. . . .

*Id.* at 597–600 (footnotes omitted and emphasis added).

In their Memorandum, the Plaintiffs contend that the Court of Claims' ruling in *AFGE v. United States* has been appealed, but they make no effort to distinguish its analysis of prudential standing under FAIR. (*See* Doc. # 12 at 15). Upon review, the Court finds the foregoing reasoning by the Court of Claims to be persuasive and equally applicable in the present case. As in *AFGE v. United States*, the Plaintiffs herein do not challenge a decision by the Air Force to place Tinker's engineering work on a list to be contracted out. Rather, they challenge the decision to award that engineering work to a particular source. For the reasons identified by the Court of Claims in *AFGE v. United States*, the Court concludes that the Plaintiffs' interest "in their continuation of their current jobs as federal employees" is not within the "zone of interests" protected or regulated by FAIR. In fact, the Plaintiffs' interest in retaining their jobs is inconsistent with the purpose of FAIR, which is "to encourage the federal government to contract out to private sources those governmental services that are "not inherently

governmental in nature." *AFGE v. United States*, 46 Fed.Cl. at 597.

In opposition to the reasoning and citation of authority set forth above, the Plaintiffs rely heavily on *Diebold v. United States of America*, No. C90–0001–L(A) (W.D. Ky April 2, 1993) (unreported),[6] to support their argument that they are within the "zone of interests" protected or regulated by (1) the Budget and Accounting Act of 1921 and (2) the Office of Federal Procurement Policy Act Amendments of 1979, both of which have been discussed, *supra*. In *Diebold*, the United States District Court for the Western District of Kentucky held, contrary to *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038 (D.C.Cir.1989), and the other legal authority discussed herein, that federal civilian employees *do* have standing to challenge a federal agency's decision to out-source work to a private entity. In reaching this conclusion, the *Diebold* court noted that federal law requires agencies to consult with their civilian employees when comparing the cost of keeping work in-house as opposed to contracting it out to a private company. *Id.* at 6. The district court in *Diebold* also reasoned that

"[i]f the legislative intent were to transfer as many commercial activities as possible to the private sector, we would have to agree with the District of Columbia Circuit that current employees' interests are inconsistent with the purposes of the statute. However, we see no evidence of such an intent. Indeed, the Secretary of Defense himself has promulgated implementing regulations reflecting an understanding that the goal is economy and fair competition

---

**6.** The district court rendered its 1993 opinion in *Diebold* on remand from the Sixth Circuit's ruling in *Diebold v. United States*, 947 F.2d 787 (6th Cir.1991), which, as noted, *supra*, concluded that federal agency procurement

decisions *are* subject to judicial review under the APA, but *expressly declined* to decide whether federal civilian employees have standing to bring such actions.

with all bidders, including in-house workers, given a fair chance."

*Id.* at 7–8 (citing various sections of the Code of Federal Regulations).

Upon review, the Court finds the district court's reasoning in *Diebold* to be unpersuasive. As noted above, the Plaintiffs in the present case have not asserted an interest in "consulting" with the Air Force regarding the contracting out of Tinker's engineering work, and they have not set forth any factual allegations regarding a failure to consult. (*See* Complaint, Doc. # 1). Furthermore, nothing in *Diebold* persuades the Court that the Plaintiffs' interest "in their continuation of their current jobs as federal employees" is within the "zone of interests" protected or regulated by the legislation cited in their Complaint. To the contrary, the Court concludes, for the reasons set forth more fully above, that the Plaintiffs' interest in maintaining their employment is contrary to the purposes of such legislation. *See, e.g., American Federation of Government Employees v. Cohen,* 171 F.3d 460, 471 (7th Cir.1999) (recognizing that "the interests of federal employment[ ] and the goal of private procurement are inconsistent"). In addition, insofar as the district court in *Diebold* relied on the federal workers' interest in "fairness" and government "economy," to satisfy the prudential standing requirements, the Court concludes, for reasons to be set forth, *infra,* that such interests constitute nothing more than "generalized grievances," which are insufficient to establish standing. *See, Coyne,* 183 F.3d at 493–494.

Finally, the Court pauses briefly to note that the present case is distinguishable from *National Air Traffic Controllers Association v. Pena,* 78 F.3d 585, 1996 WL 102421 (6th Cir. March 7, 1996) (unpublished), which appears to be the only Sixth Circuit case even touching upon the standing of civilian employees to challenge federal agency procurement actions. In *Pena,* the Sixth Circuit held that federal employees and their union *did* have standing to challenge a federal agency decision that air traffic control services are not "inherently governmental functions" (which cannot be out-sourced under federal law). In reaching its decision, the Sixth Circuit noted that the plaintiffs' alleged interest was in preserving "government functions that are so inherently governmental that they should not be privatized." The *Pena* court held that this interest fell within the "zone of interests" of the Office of Federal Procurement Policy Act Amendments of 1979, 41 U.S.C. § 401, *et seq.* In so doing, however, the Sixth Circuit distinguished the D.C. Circuit's ruling in *Cheney,* upon which this Court has relied herein. In distinguishing *Cheney,* the *Pena* court reasoned:

> In *Nat'l Fed'n of Fed. Employees [v. Cheney],* a group of federal employees challenged the Army's decision to contract out its motor pool. At issue was the application of the zone of interest test to the same statutes involved in the present case, the OFPPAA and the Act of 1921; and, additionally, the National Defense Authorization Act of 1987. The D.C. Circuit held that the employees' interest in preserving their government jobs was not within the zone of interests of the relevant statutes, and, therefore, the federal employees lacked standing to sue. *Nat'l Fed'n of Fed. Employees,* 883 F.2d at 1050. However, the issue in *Nat'l Fed'n of Fed. Employees* was solely confined to the federal employees' challenge that the Army had erred in its cost comparison calculation. Thus, with regard to the OFPPAA, the D.C. Circuit's analysis was confined to whether the loss of federal government jobs due to an error in the cost comparison determination was within the zone of interest

of the OFPPAA. The D.C. Circuit concluded that the protection of federal jobs was not within the OFPPAA's interest of promoting efficiency in government. *Id.* at 1049.

The court specifically noted that no assertion had been made in its case that the goods or services involved were inherently governmental, and the court quoted from the legislative history of the OFPPAA indicating the importance of retaining inherently governmental services. *Id.* Accordingly, the question of standing in relation to inherently governmental functions was not presented in *Nat'l Fed'n of Fed. Employees,* and the ultimate result differed because the interest of the OFPPAA in preserving inherently governmental functions was not implicated by the plaintiffs in that case. Thus, our decision in this case is not at odds with *Nat'l Fed'n of Fed. Employees [v. Cheney].*

*Id.* at *6.

For precisely the same reason that the Sixth Circuit found the D.C. Circuit's ruling in *Cheney* to be distinguishable from *Pena,* this Court finds *Pena* to be distinguishable from the present action. Unlike *Pena,* the present action *does* involve a challenge to a cost-comparison analysis brought by federal civilian employees who assert an interest in maintaining their jobs, and *not* a challenge to a determination that a particular task is an "inherently governmental function." As the *Pena* court expressly recognized, it did not address the issue raised in both *Cheney* and in the present case. In fact, the *Pena* court noted that its ruling was entirely consistent (i.e., "not at odds") with *Cheney.* Consequently, this Court concludes, based upon *Cheney* and the substantial weight of other legal authority cited, *supra,* that the Plaintiffs' interest in maintaining their federal employment is not even arguably within the "zone of interests" regulated or protected by the various statutes cited in their Complaint.

### C. Plaintiffs Assert a "Generalized Grievance"

 As noted, *supra,* in addition to asserting an interest in keeping their jobs, the Plaintiffs assert an interest in "a legally conducted and fair public/private competition" with respect to the Air Force's awarding of the engineering contract. (Doc. # 12 at 9). According to the Plaintiffs, this interest includes an interest in ensuring that the Air Force obtains "cost-effective performance of its workload." (*Id.* at 14). The Plaintiffs argue that their interests in fairness, government efficiency and obtaining the "best value for the taxpayer in performing the public's business" are reflected in the sections of 10 U.S.C. § 2461, *et seq.,* that are referenced in their Complaint.

Upon review, the Court concludes that the Plaintiffs' interests in fairness, cost-efficiency and obtaining "value" for the public constitute nothing more than "generalized grievances," which are insufficient to satisfy prudential standing requirements. As the D.C. Circuit noted in *Cheney,* "[i]f governmental efficiency was appellants' interest, then they would have no greater Article III injury in fact than any taxpayer opposing a government appropriation." *Cheney,* 883 F.2d at 1048. Although an interest in either government efficiency or in the fairness of the outsourcing process *might* fall within the "zone of interests" protected or regulated by the statutes at issue herein, such generalized interests are insufficient to establish prudential standing. *Id.* at 1048–49; *see also American Federation of Government Employees v. Cohen,* 171 F.3d 460, 470–471 (7th Cir.1999) (recognizing that an interest in the "lawful and economic conduct

of the contracting-out process" is a "generalized grievance," which is insufficient to satisfy the prudential standing requirements). Consequently, the Court concludes that the Plaintiffs' interests in "a legally conducted and fair public/private competition" and in "cost-effective performance" of the Air Force's work fail to satisfy the prudential standing requirements identified by the Sixth Circuit in *Coyne,* 183 F.3d at 493–494 (recognizing that "a plaintiff's claim must be more than a 'generalized grievance' that is pervasively shared by a large class of citizens").

### D. *Lack of "Associational Standing" by AFGE*

In order for AFGE to assert standing as a representative of its union members, it must establish (1) that its members would otherwise have standing to sue in their own right, (2) that the interests it seeks to protect are consistent with its organizational purpose, and (3) that neither the claim asserted nor the relief requested herein requires the participation of its individual members. *See, e.g., Gillis v. U.S. Dept. of Health and Human Services,* 759 F.2d 565, 569 (6th Cir.1985). In the present case, AFGE cannot meet the first requirement, because the Court has found that the three individual Plaintiffs lack standing to sue in their own right. As a result, AFGE lacks standing to pursue this litigation in a representative capacity.

### II. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Defendants' Motion to Dismiss (Doc. # 5) is sustained.

Judgment will be entered in favor of the Defendants and against the Plaintiffs.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.